## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FRESENIUS KABI USA, LLC
3 Corporate Drive
Lake Zurich, Illinois 60047

        Plaintiff,

    v.

UNITED STATES OF AMERICA,

STEPHANIE CARLTON,
in her official capacity as Acting Administrator of the
Centers for Medicare and Medicaid Services,
Office of the Administrator
7500 Security Boulevard
Baltimore, MD 21244

CENTERS FOR MEDICARE AND MEDICAID
SERVICES,
7500 Security Boulevard
Baltimore, MD 21244

ROBERT F. KENNEDY, JR.,
in his official capacity as Secretary of U.S.
Department of Health and Human Services
Office of the Secretary
200 Independence Avenue, SW
Washington, DC 20201

U.S. DEPARTMENT OF HEALTH AND HUMAN
SERVICES
200 Independence Avenue, SW
Washington, DC 20201

        Defendants.

Case No. _____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Fresenius Kabi USA, LLC ("Fresenius Kabi" or "Plaintiff") brings this Complaint against

the United States of America, the Department of Health and Human Services, the Secretary of

1

Health and Human Services, the Centers for Medicare & Medicaid Services, and the Acting Administrator of the Centers for Medicare & Medicaid Services (collectively, "Defendants") seeking declaratory and injunctive relief.

## **INTRODUCTION**

1.     In 1990, Congress enacted section 1927 of the Social Security Act ("SSA") to establish the Medicaid Drug Rebate Program ("MDRP"). Section 1927 requires each participating drug manufacturer to pay quarterly rebates to state Medicaid agencies based on the quantity of eligible outpatient drug prescriptions each state Medicaid agency reimburses in a given quarter for the manufacturer's drugs.

2.     Section 1927 provides for two tiers of rebates:  a higher percentage rebate for "innovator" drugs and a lower percentage rebate for "noninnovator" drugs.  Congress intended to extract larger rebates from pioneer drugs, *i.e.*, those "that received some form of patent or marketing protection for a specific period of time." 60 Fed. Reg. 48442, 48453 (Sept. 19, 1995). Pioneer drugs typically "benefit[] from a lack of competition and increased profits for a specific period of time" and are therefore required to pay larger rebates than generic drugs. *Id.*  The proper classification of a drug as pioneer/innovator or generic/non-innovator thus has a financial impact on the magnitude of rebates owed.

3.     Fresenius Kabi is a generic drug manufacturer that participates in the MDRP. Among other things, Fresenius Kabi specializes in the production of generic injections, many of which have been designated essential medicines by the World Health Organization ("WHO") and/or U.S. Food and Drug Administration ("FDA").  Because injections are administered directly into the bloodstream, they raise special complexities.  For instance, the inactive ingredients in an injection may present questions of safety and efficacy that do not arise when a drug is ingested orally.  Further, injections can be more difficult to manufacture because they must be sterile (and

2

are frequently in shortage for that reason).  For these and other reasons, generic injections often receive heightened scrutiny from FDA as compared to other types of generics.  In many cases, FDA has required generic manufacturers like Fresenius Kabi to submit full new drug applications ("NDAs") for their proposed generic injections.

4.      Several years ago, the Centers for Medicare & Medicaid Services ("CMS") began contesting whether Fresenius Kabi's generic injections are, in fact, generic drugs.  In particular, CMS took the position that whenever FDA has required an NDA to review and approve a proposed generic injection, the resulting product is a pioneer (not a generic) that owes the higher rebates applicable to innovator products.  CMS took that position irrespective of the reason or reasons why FDA required an NDA.

5.      Fresenius Kabi has consistently opposed CMS's position as both legally flawed and factually incorrect.  In 2024, Fresenius Kabi sued to compel CMS to recognize that five of Fresenius Kabi's generic injections (heparin sodium, oxytocin, furosemide, magnesium sulfate and neostigmine methylsulfate) owed only non-innovator rebates for the period before April 1, 2016. *See Fresenius Kabi USA LLC v. United States*, No. 24-676 (D.D.C.).  Rather than litigate, CMS made a policy change and granted relief as to those drugs.  *See* CMS, Manufacturer Release No. 120, *Drug Classification for Drugs Granted a Narrow Exception* (June 26, 2024), *available at* https://www.medicaid.gov/prescription-drugs/downloads/mfr-rel-120.pdf.

6.      In this Complaint, Fresenius Kabi similarly sues to compel CMS to recognize that generic injections owe only non-innovator rebates.  The drugs at issue in this action are:

(i)      Lidocaine hydrochloride (NDA 006488 and NDA 017584);

(ii)     Bupivacaine hydrochloride (NDA 018304);

(iii)    Indomethacin (NDA 022536);

      (iv)     Tobramycin sulfate (NDA 050789);

      (v)     Argatroban (NDA 201811);

      (vi)     Glucagon hydrochloride (NDA 201849);

      (vii)     Moxifloxacin hydrochloride (NDA 205572);

      (viii)     Tigecycline (NDA 205645).

Most of the above drugs are several generations old (*e.g.*, glucagon was discovered in the 1920s, while lidocaine was invented in the 1940s). Even the "youngest" of the drugs, tigecycline, dates to the prior century. They are all marketed by Fresenius Kabi as high-quality, low-cost injections.

      7.     None of these injections is an innovator drug under the original MDRP statue. For the period prior to April 18, 2019 (before Congress amended the MDRP statute), none of these injections was "[originally] marketed under an original new drug application approved by the Food and Drug Administration." 42 U.S.C. § 1396r-8(k)(7)(A)(ii); *see STI Pharma, LLC v. Azar*, 613 F. Supp. 3d 152, 167, 169 (D.D.C. 2020) (holding that "follow-on" or "generic" versions of "pioneer" drugs are "noninnovators"). With one exception (lidocaine marketed under NDA 006488), these injections are also non-innovators under the amended version of the MDRP because each is a generic duplicate of a previously approved, pioneer product.

      8.     Lastly, if CMS's refusal to classify these drugs as non-innovators were deemed to be non-final, then CMS has engaged in unreasonable delay. After Fresenius Kabi's requests were pending more than six years, in letters dated January 19, 2023 through June 23, 2023, CMS denied reclassification but invited Fresenius Kabi to submit additional evidence and argument. Fresenius Kabi submitted timely letters that (i) explained that CMS's determinations were improper, (ii) provided further evidence that these drugs are non-innovators, and (iii) offered to meet with CMS to discuss these determinations on repeated occasions. CMS has offered no substantive response

or even a timetable for doing so.  In June 2024, when Fresenius Kabi requested to meet with CMS about these drugs, CMS acknowledged the e-mail and stated:  "we will get back to you."  Over nine months later, Fresenius Kabi has heard nothing.

9.      Fresenius Kabi has filed this action (1) to obtain proper classification of its generic drugs as non-innovators, or (2) at a minimum, to require CMS to issue judicially reviewable final determinations within 60 days of any decision by this Court.  *See In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 420 (D.C. Cir. 2004) (ordering agency to "issue a judicially reviewable response . . . within 45 days" of the Court's opinion).

## **THE PARTIES**

10.      Fresenius Kabi is a limited liability company organized and existing under the laws of Delaware, having its principal place of business at 3 Corporate Drive, Lake Zurich, Illinois. Plaintiff is a pharmaceutical company that specializes in lifesaving medicine and technologies for infusion, transfusion, and clinical nutrition.  The majority of its drug portfolio consists of non-innovator, multiple source drugs, including the drugs at issue in this case.

11.      Defendant Department of Health and Human Services ("HHS") is an executive department of the United States Government.   HHS's headquarters are located at 200 Independence Ave., S.W., Washington, D.C. 20201.

12.      Defendant Robert F. Kennedy, Jr. is named in his official capacity as Secretary of HHS ("Secretary"), in whom is vested the authority by statute to implement the requirements of the Social Security Act, including the MDRP.[1]  Secretary Kennedy maintains his office at 200 Independence Ave., S.W., Washington, D.C. 20201.  He is being sued in his official capacity only.

---

[1] "[T]he United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, that any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance." 5 U.S.C. § 702.

13.    Defendant CMS is an agency within HHS.  Its headquarters and principal place of business are at 7500 Security Boulevard, Baltimore, MD  21244.

14.    Defendant Stephanie Carlton is named in her official capacity as Acting Administrator of CMS, to whom HHS has delegated authority to implement certain requirements of the Social Security Act, including the MDRP.  Defendant Carlton maintains her office at 7500 Security Boulevard, Baltimore, MD 21244.  She is being sued in her official capacity only.

## JURISDICTION AND VENUE

15.    Plaintiff Fresenius Kabi's action arises under the laws of the United States, including the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, *et seq*., and the Social Security Act.  *See* 42 U.S.C. § 1396r-8.

16.    This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 (federal question) and 1361 (action to compel federal officer to perform his or her duty).

17.    The Court has authority to grant the relief requested by Fresenius Kabi pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701-706, the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the All Writs Act, 28 U.S.C. § 1651.

18.    There exists between the parties an actual controversy, justiciable in nature, wherein Plaintiff seeks a declaration of its rights by this Court and injunctive relief.

19.    Venue is proper in this district under 28 U.S.C. § 1391(e) because one or more Defendants reside in this judicial district.

20.    Defendants' refusal to classify the Fresenius Kabi drugs at issue as non-innovator, multiple source drugs is final agency action.  *See* 5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (explaining that agency action is final if it (1) "mark[s] the 'consummation' of the agency's decisionmaking process" and (2) determines "rights or obligations" or causes "legal consequences [to] flow"); *see also Her Majesty the Queen in Right of Ontario* v. *EPA*, 912 F.2d

1525, 1531 (D.C. Cir. 1990) ("[A]gency inaction may represent effectively final agency action that the agency has not frankly acknowledged."); *Environmental Defense Fund, Inc.* v. *Hardin*, 428 F.2d 1093, 1098–99 (D.C. Cir. 1970) ("[E]xigent circumstances" may "render" an agency's "failure to act . . . equivalent to a final denial" such that "administrative inaction has precisely the same impact on the rights of the parties as denial of relief[.]"); *Friedman* v. *FAA*, 841 F.3d 537, 541–43 (D.C. Cir. 2016) (concluding that agency conduct was "a constructive denial" because the agency "ha[d] made up its mind" even in the absence of a "formal acknowledgement").

21.    Fresenius Kabi has standing to bring this lawsuit because it has been harmed by Defendants' refusal to classify the Fresenius Kabi drugs at issue as non-innovator multiple source drugs. *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 432–33 (1998); *Am. Fuel & Petrochemical Mfrs. v. EPA*, 3 F.4th 373, 379–80 (D.C. Cir. 2021); *Airlines for Am. v. TSA*, 780 F.3d 409, 410–11 (D.C. Cir. 2015). That harm includes liability for increased rebates for drugs misclassified as innovators. If Fresenius Kabi prevails, CMS will allow Fresenius Kabi to treat the drugs at issue as non-innovators, and Fresenius Kabi could then realize the benefit of lower rebate amounts. *STI Pharma*, 613 F. Supp. 3d at 163 (quoting *Klamath Water Users Ass'n v. FERC*, 534 F.3d 735, 739 (D.C. Cir. 2008)).

## STATUTORY AND REGULATORY BACKGROUND

### A.    The New Drug Application Requirement

22.    As originally enacted, section 505(a) of the Federal Food, Drug and Cosmetic Act ("FDCA") prohibited interstate distribution of a "new drug" unless an NDA was "effective" for "such drug." Ch. 675, § 505(a), 52 Stat. 1040, 1052 (1938).

23.    Under the 1938 FDCA, NDAs submitted to FDA were not "approved," but rather became effective, automatically, on the sixtieth day after filing, unless FDA blocked the application. As the Supreme Court has observed, "affirmative approval of FDA" was not required

because "an NDA would automatically become effective unless a contrary order were issued." *USV Pharm. Corp. v. Weinberger*, 412 U.S. 655, 660–61 (1973).

24.     In 1962, Congress enacted the Kefauver-Harris Drug Amendments of 1962.  Pub. L. No. 87-781, § 102, 76 Stat. 780, 781 ("1962 Amendments").  Since then, section 505(a) of the FDCA has prohibited interstate distribution of a "new drug" unless an NDA has been affirmatively approved by FDA.  *See* 21 U.S.C. § 355(a).

### B.     Generic Drug Approval

25.     Under the 1938 FDCA, no application was required to market a generic drug.  Once an NDA was in effect for a pioneer drug, other manufacturers could launch "me too" or "generic" versions without any sort of FDA application.  *See* Statement of Dr. Marion Finkel, Director, Bureau of Drugs, FDA, Docket No. 79-P-0484/PSA, ¶ 32 (Dec. 1, 1980) ("Finkel Statement"); *see also* 40 Fed. Reg. 26142, 26143 (June 20, 1975).

26.     The 1962 Amendments changed that.  In addition to requiring affirmative approval for NDAs, the 1962 Amendments amended section 505 to require proof that drugs are effective for their intended uses.  Congress also included transitional provisions to address the thousands of NDAs that had taken effect prior to 1962 without FDA's approval.  Those applications were "deemed . . . approved" and their sponsors were given two years to submit substantial evidence of their efficacy.  76 Stat. at 788.  After that time, FDA was directed to withdraw any NDA lacking substantial evidence of efficacy.  *See id.*

27.     To accomplish this transition, FDA partnered with the National Academy of Sciences/National Research Council to review the claims made for thousands of drug substances covered by deemed approved NDAs.  *See* 31 Fed. Reg. 9426 (July 9, 1966).  That effort was known as the Drug Efficacy Study Implementation ("DESI") program.

28.    If a DESI review found that a drug substance was effective, FDA would announce that finding in the Federal Register and specify the indications, labeling, and other conditions of approval for the drug substance.  That announcement applied to *both* the pioneer product covered by the pre-1962 NDA *and* any unapproved generics.  *See* 21 C.F.R. § 310.6(a).  The pioneer sponsor was required to file a supplement showing compliance with the announcement, while manufacturers of generics were required to submit new applications showing the same.  *See, e.g.*, 36 Fed. Reg. 6909 (Apr. 10, 1971) (instructions for lidocaine).

29.    Generic drug approval was substantially amended in 1984 by the Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984) ("Hatch-Waxman Amendments").  Under the Hatch-Waxman Amendments, there are now four available approval pathways for new drugs (other than biological products).

30.    The first pathway is an NDA under section 505(b)(1) of the FDCA.  *See* 21 U.S.C. § 355(b)(1).  These applications require the applicant to conduct (or obtain a right to reference to) ***all*** of the studies contained in the application to show that the drug is safe and effective.  Many "innovator" or "pioneer" drugs are approved pursuant to section 505(b)(1).

31.    The second pathway applies if the application relies on evidence of safety or efficacy ***other than*** studies conducted by the applicant (or to which the applicant has a right of reference).  That other evidence can include published literature or FDA's previous approval of another drug (a "listed drug").  This second pathway is subject to additional requirements set out in section 505(b)(2) of the FDCA (mainly patent certification requirements that exist to protect the intellectual property of the sponsor of the listed drug) and is commonly called a "505(b)(2) application."  *See* 21 U.S.C. § 355(b)(2).  Both pioneer drugs and generic drugs can be approved pursuant to 505(b)(2) applications.

32.    The third pathway is an abbreviated new drug application ("ANDA"), which does not require a direct showing that the proposed drug is safe and effective.  Instead, an ANDA must show that the proposed drug is *the same as* a "reference listed drug" ("RLD") in terms of active ingredient, dosage form, strength, route of administration, labeling, quality, performance characteristics, and intended use.  *See* 21 U.S.C. § 355(j)(2)(A)(i)–(v).  That showing allows FDA to conclude that the proposed drug is equivalent to the RLD and, on that basis, *infer* that the proposed drug will be safe and effective.

33.    The fourth pathway is called a "petitioned ANDA."  This pathway allows a sponsor to submit an ANDA for a proposed drug that is not identical to the RLD in one or more characteristics.  FDA's permission must be obtained in advance pursuant to a suitability petition (hence the name).  *See* 21 U.S.C. § 355(j)(2)(C).  Permissible changes include changes in active ingredient, route of administration, dosage form, or strength, *id.*, but must not be so significant as to require new safety or efficacy studies, *see id.* § 355(j)(2)(i).

34.    Since the Hatch-Waxman Amendments, most generic drugs have been approved pursuant to ANDAs or petitioned ANDAs.  Nevertheless, there remain many situations in which FDA's approval for a generic drug may (or must) be obtained through an NDA rather than an ANDA.  A number of those are relevant here.

35.    First, the Hatch-Waxman Amendments did not cause FDA to revisit any prior generic drug approvals, meaning that any generics approved prior to 1984 remain approved today pursuant to generic NDAs.  The lidocaine injections marketed by Fresenius Kabi pursuant to NDA 017584 and the bupivacaine injections marketed by Fresenius Kabi pursuant to NDA 018304 are examples of this.  Both NDAs were filed for generic duplicates of earlier pioneer drugs, and both were approved prior to 1984.

36.    Second, FDA occasionally requires NDAs for generic versions of complex drug substances.  Drug substances that (i) are complex mixtures, (ii) present known stability or bioequivalence problems, (iii) are naturally derived, (iv) require unusual manufacturing steps, or (v) are otherwise macromolecules often require additional studies or more careful review than is appropriate for the ANDA pathway.  The glucagon injections marketed by Fresenius Kabi pursuant to NDA 201849 are an example of this.  Glucagon is a naturally occurring peptide hormone. Although it previously prohibited the filing of ANDAs for any generic peptides, FDA now allows ANDAs for some generic peptides. *See FDA Guidance for Industry:  ANDAs for Certain Highly Synthetic Peptide Drugs Products That Refer to Listed Drugs of rDNA Origin*, at 3–4 (May 2021) ("In the past, analytical methods have not always been capable of adequately characterizing peptide products for submission in an ANDA.  However, given the current state of technology for peptide synthesis and characterization . . . , FDA now believes it is possible for an ANDA applicant to demonstrate that the active ingredient in a proposed generic.")

37.    Third, FDA often requires NDAs for generic injections that use different inactive ingredients (also known as "excipients") than the pioneer drug.  This is an extra-statutory requirement imposed by FDA in the late 1980s.  *See* 54 Fed. Reg. 28872, 28883 (July 10, 1989) ("The agency intends to place more stringent limitation on the variations permitted in the inactive ingredients in the formulation of parenteral [*i.e.*, injectable] . . . drug products than on other dosage forms").  Most generic drugs contain different excipients than the earlier pioneers.  Some excipient changes are unavoidable because the excipient content of the pioneer drug is a secret.  Others can reduce manufacturing costs, thereby enabling lower cost generics.  Excipient changes can mitigate patent infringement risks, or can be made to address ingredient shortages.

38.     The tobramycin, argatroban, moxifloxacin, tigecycline, and indomethacin injections marketed by Fresenius Kabi are all examples of generic injections for which FDA required an NDA based solely on an excipient change.  Importantly, Congress amended the FDCA in 2022 to confirm that generic injectables that require an NDA because of FDA's excipient rule should still be considered generic drugs that are eligible for automatic substitution at the point of dispensing.  *See* 21 U.S.C. § 355(j)(7)(A)(v)(I).

### C.     The Medicaid Drug Rebate Program

39.     In 1990, Congress adopted the MDRP.  *See* Omnibus Reconciliation Act, Pub. L. 101-508, Title IV, Subtitle B, Part 1, § 4401(a)(3), 104 Stat. 1388, 1388-143 (1990).  Congress did so "to offset Medicaid costs incurred by the federal government and the states for outpatient drugs provided to Medicaid recipients."  *Council on Radionuclides & Radiopharmaceuticals, Inc. v. Azar*, No. 18-633, 2019 WL 5960142, at *2 (D.D.C. Nov. 13, 2019); *see Astra USA, Inc. v. Santa Clara Cty.*, 563 U.S. 110, 114 (2011).

40.     Section 1927 of the MDRP statute provides that drug manufacturers must enter into rebate agreements with HHS and agree to pay rebates to the states to receive state Medicaid payments for covered outpatient drugs.  42 U.S.C. § 1396r-8(a)(1).

41.     Section 1927 also sets forth the terms for such rebate agreements.  *Id*. § 1396r-8(b); *see also Pharm. Research & Mfrs. v. Walsh*, 538 U.S. 644, 652 (2003).  It sets rebate rates for three categories of drugs:  (1) single source drugs, (2) innovator multiple source drugs, and (3) non-innovator multiple source drugs.  42 U.S.C. § 1396r-8(c)(1), (3); *id*. § 1396r-8(k)(7)(A).

42.     Drug manufacturers pay a higher rebate rate to state Medicaid agencies for drugs falling into the first (single source) and second (innovator multiple source) categories than for those drugs in the third category (non-innovator multiple source).  *Compare* 42 U.S.C. § 1396r-

8(c)(1) & (2) *with id.* § 1396r-8(c)(3); *see* Medicaid Program; Covered Outpatient Drugs, 81 Fed. Reg. 5170, 5196 (Feb. 1, 2016).

43.    Under the pre-2019 version of section 1927, a "single source drug" was defined as "a covered outpatient drug which is produced or distributed under ***an original*** new drug application approved by the Food and Drug Administration."  42 U.S.C. § 1396r-8(k)(7)(A)(iv) (2012 version) (emphasis added).  A "multiple source drug" was defined as "a covered outpatient drug . . . for which there [is] at least 1 other drug product which—(I) is rated as therapeutically equivalent . . . (II) . . . is pharmaceutically equivalent and bioequivalent . . . and (III) is sold or marketed in the United States during the period." *Id*. § 1396r-8(k)(7)(A)(i).  An "innovator multiple source" drug was defined as "a multiple source drug that was ***originally*** marketed under an ***original new drug application*** approved by the Food and Drug Administration." *Id*. § 1396r-8(k)(7)(A)(ii) (emphases added).  Finally, a "noninnovator multiple source" drug was defined as "a multiple source drug that is not an innovator multiple source drug." *Id*. § 1396r-8(k)(7)(A)(iii).

44.    The drugs at issue in this action all are subject, in part, to the pre-2019 version of statute—which went unchanged in relevant respects from its enactment in 1990 until the 2019 amendments. *See STI Pharma*, 613 F. Supp. 3d at 158.

45.    The drugs at issue here are also subject to the version of section 1927 that Congress amended on April 18, 2019. *See* Medicaid Services Investment and Accountability Act of 2019, Pub. L. No. 116-16, 133 Stat. 852 § 6(c) (2019).  In the 2019 Amendments, Congress changed the definition of "innovator multiple source drug" by striking the words "originally" and "an original." Congress also added language referencing a "narrow exception" adopted by the Secretary of HHS. As a result, since April 18, 2019, the definition of innovator multiple source drug now reads:

> [A] multiple source drug that is marketed under a new drug application approved by the Food & Drug Administration, unless the Secretary determines that a narrow

exception applies (as described in section 447.502 of title 42, Code of Federal Regulations (or any successor regulation)).

*Id.*; *see* Pub. L. 116-16, § 6(e) (stating that 2019 amendments took effect on April 18, 2019 and "apply to covered outpatient drugs supplied by manufacturers under agreements under section 1927 . . . ***on or after such date***.") (emphasis added).

      **D.**    **CMS's Narrow Exception Regulation**

     46.    CMS and its predecessor have issued numerous notices of proposed rulemakings and final rules construing the MDRP statute and its drug categories.

     47.    In 1995, the Health Care Financing Administration ("HCFA"), CMS's predecessor, published a proposed rule to implement the MDRP. HCFA acknowledged that no relevant statute "define[s] the term 'original NDA'" in the definitions of "single source" and "innovator multiple source" drugs. *See* Medicaid Program; Payment for Covered Outpatient Drugs Under Drug Rebate Agreements with Manufacturers, 60 Fed. Reg. 48442, 48453 (Sept. 19, 1995) (proposed rule).

     48.    HCFA proposed to "interpret [the term] to comport with [the agency's] understanding of the intent of the Congress" and, thus, to mean an "FDA-approved drug or biological application that received one or more forms of patent protection . . . or marketing exclusivity rights granted by the FDA." *Id.*

     49.    HCFA explained the two-tiered system of rebates reflected in section 1927. HCFA first noted that the statute "requires larger rebates for single source and innovator multiple source drugs," and therefore concluded that "the term 'original NDA' was included in [§§] 1927(k)(7)(A)(ii) and (iv) of the Act for the purposes of extracting larger rebates from those products that received some form of patent or marketing protection for a specific period of time . . . than noninnovators that produce generic drugs with no market protection." *Id.* ("We believe the term 'original NDA,' as proposed above, produces this effect.").

50.     The proposed rule also would have defined a "noninnovator multiple source" drug to include "all products approved under an abbreviated new drug application, [or a] paper new drug application under the FDA's former 'Paper NDA' policy, or an application under section 505(b)(2) of the [FDCA]." *Id*. at 48482.

51.     These proposed definitions remained pending from 1995 until 2007, when CMS published a final rule that addressed the definition of an "innovator multiple source" drug.

52.     The 2007 rule defined the term "single source drug" to mean a drug "produced or distributed under an original NDA approved by the FDA." Medicaid Program; Prescription Drugs, 72 Fed. Reg. 39142, 39241 (Jul. 17, 2007). CMS defined "innovator multiple source drug" to mean "a multiple source drug that was originally marketed under an original [NDA]." *Id*. at 39240. The 2007 rule also defined "noninnovator multiple source drug" to include drugs "marketed under an [ANDA]" and drugs "that entered the market before 1962 [and were] not originally marketed under an original NDA." *Id*.

53.     Unlike the 1995 proposal, the 2007 rule (i) no longer included products that were approved pursuant to paper NDAs or 505(b)(2) applications in the definition of "noninnovator multiple source drug" and (ii) did not include a definition of "original NDA." Instead, CMS took the position that the word "original" was a nullity, such that every "NDA" should be considered an "original NDA." *See id*. at 39163. CMS stated: "We do not see the need to add a definition of NDA in this final rule. Further, the FDA does not make a distinction between an NDA and an original NDA; therefore, we view these terms as having the same meaning." *Id*.

54.     In February 2012, CMS published a proposed rule in which it acknowledged that "questions have arisen regarding whether an 'original NDA' is the same as an NDA and whether

the drug category may be different if a drug is approved under an NDA." Medicaid Program; Covered Outpatient Drugs, 77 Fed. Reg. 5318, 5323 (Feb. 2, 2012).

55.    CMS reiterated that every NDA is an "original" NDA. *See id.* ("[A]n original NDA is equivalent to an NDA filed by the manufacturer for approval under section 505 of the FFDCA for purposes of approval by the FDA for safety and effectiveness."). CMS proposed to delete the word "original" from its regulatory definition, notwithstanding that "original" was in the statutory definition adopted by Congress. *See id.* ("[W]e are proposing to use the term 'NDA' when addressing such application types for brand name drugs and ***not use the term 'original NDA'*** when referring to such drugs.") (emphasis added).

56.    CMS finalized the current regulation in February 2016. *See* Medicaid Program; Covered Outpatient Drugs, 81 Fed. Reg. 5170, 5190 (Feb. 1, 2016). CMS summarized comments that had taken issue with its stated intention to read "original NDA" as the equivalent of "NDA." Those commenters stated that "CMS has no authority to read out any word from the statute," especially when the term "'original new drug application' is unique to section 1927" and is used to "clarif[y] the distinction Congress made between innovator and generic drugs." *Id*. at 5190–91. Commentors also explained that if Congress had wanted to simply distinguish between ANDAs and NDAs, it "would have used only those terms, like [it] did elsewhere." *Id*. at 5191. Commenters also highlighted that the agency's decision to equate "original NDA" and "NDA" was irrational because it ignored "the circumstances surrounding the approval" and "the changing history of FDA's approval process." *Id*. at 5190–91. Commenters further showed that CMS had no reasonable basis to force "manufacturers of certain 'generics' [to] pay higher rebates only because they [were] approved under an NDA." *Id*. at 5191.

57.     In response, CMS reiterated its position that "'original NDA' is designed typically to mean an NDA (including an NDA filed under [§] 505(b)(1) or (2) of the [FDCA])." *Id.*

58.     At the same time, however, CMS recognized what it called "narrow exceptions" to its position that every NDA should be considered an "original NDA."

> There may be very limited circumstances where, for the purposes of the [MDRP], certain drugs might be more appropriately treated as if they were approved under an ANDA and classified as a noninnovator multiple source drug. For example, certain parenteral drugs in plastic immediate containers, for which FDA required that an NDA be filed, might be more appropriately treated, for purposes of the [MDRP], as if they are marketed under an ANDA and classified as a noninnovator multiple source drug. Likewise, certain drugs approved under a paper NDA prior to the enactment of the Hatch-Waxman Amendments of 1984 or under certain types of literature-based 505(b)(2) NDA approvals after the Hatch-Waxman Amendments of 1984 might be more appropriately treated as if they were approved under an ANDA and classified as a noninnovator multiple source drug, depending on the unique facts and circumstances of the particular situation. *Id.*

59.     CMS stated that "the narrow exception will not be considered applicable to drugs marketed under NDAs that were not approved under either the paper NDA process prior to 1984 or under certain types of literature-based 505(b)(2) approvals, or for drugs that received patent protection or statutory exclusivity." *Id.*

60.     On May 2, 2016, CMS released a "Medicaid Rebate Program Notice for Participating Drug Manufacturers," which addressed the "narrow exception" in 42 C.F.R. § 447.502. *See CMS Release No. 98: Medicaid Drug Rebate Program Notice for Participating Drug Manufacturers* (May 2, 2016) ("Release No. 98"). Release No. 98 further stated that the narrow exception was designed "to ensure that drugs that are or were required to be marketed under an original new drug application for technical reasons" would not be erroneously classified as innovator drugs. *Id.* at 1.

61.     Release No. 98 identified three "examples of drugs with NDA approvals which might be more appropriately treated as if they were approved under an ANDA and classified as

non-innovator multiple source drugs." *Id.* The examples were the same ones identified in the preamble to the final rule: (1) injectable drugs in plastic immediate containers for which FDA required an NDA; (2) drugs approved under a paper NDA prior to 1984; and (3) drugs approved pursuant to literature-based 505(b)(2) new drug applications. Release No. 98 also stated that a narrow exception would not be granted to any drug that "received patent protection or statutory exclusivity." *Id.* at 2.

62.     CMS does not publish its narrow exception decision letters, making precedent difficult to assess. However, in decision letters sent to Fresenius Kabi, CMS also has stated that a controlling consideration for a narrow exception is whether the drug that was approved pursuant to the NDA was a duplicate of a previously approved drug. *See, e.g.*, Letter from C. Denemark, CMS to C. Elkins, Fresenius Kabi re: Argatroban, at 3 n.1 (May 15, 2023) ("a duplicate of a drug approved under an NDA . . . would be classified as a noninnovator"). CMS also has stated that an important consideration is whether a similar application could today be filed as an ANDA. *See, e.g.*, Letter from C. Denemark, CMS to C. Elkins, Fresenius Kabi, at 4 n.1 re: Lidocaine & Xylocaine (Jan. 19, 2023) (a drug approved under a paper NDA is "more appropriately treated as a noninnovator" "ONLY if it would now be approved under section 505(j)," *i.e.*, the ANDA approval pathway).

## FACTUAL BACKGROUND

63.     The drugs at issue in this action correspond to nine different NDAs.

### 1.     Lidocaine hydrochloride (NDA 006488)

64.     Fresenius Kabi owns two NDAs for lidocaine hydrochloride injections. One is NDA 006488 for the pioneer version of lidocaine hydrochloride, marketed as Xylocaine®.

65.     Xylocaine is not an innovator drug under the original version of the MDRP statute because it was not "originally marketed" under an NDA "originally approved" by FDA. A

Swedish company called AB Astra ("Astra") submitted NDA 006488 for Xylocaine on April 30, 1948, which took effect automatically, without FDA approval, a few months later.

66.    NDA 006488 did not become approved by FDA until much later.  In 1971, FDA announced, as part of the DESI program, that all marketed lidocaine injections (which at the time included both Xylocaine and many generics) were "effective for production of local anesthesia by infiltration injection, nerve block, caudal, or other epidural blocks."  36 Fed. Reg. at 6910.  Based on that determination, FDA instructed Astra to submit a supplement to conform its application to the DESI announcement.  *Id.* at 6911.  When FDA approved that supplement in 1972, the agency said:  "This action approves your application, as supplemented, on the basis of effectiveness of the drug as well as safety."

67.    Xylocaine was thus marketed *without* FDA approval from 1948 through 1971.

68.    In 1999, Astra merged with Zeneca PLC to form AstraZeneca.  In 2006, AstraZeneca divested Xylocaine to Abraxis BioScience, Inc. ("Abraxis").  In 2007, Abraxis spun off its sterile injection business as APP Pharmaceuticals, Inc. ("APP"), which was acquired by Fresenius Kabi in 2008.

### 2.    Lidocaine hydrochloride (NDA 017584)

69.    Fresenius Kabi also owns NDA 017584 for generic lidocaine hydrochloride. Lidocaine marketed under NDA 017584 is not an innovator drug under any version of the MDRP statute because NDA 017584 was not an "original NDA" and because it sought approval for a generic duplicate of the pioneer drug, Xylocaine.

70.    By way of background, Astra originally marketed Xylocaine solely as a local anesthetic.  In 1964, Astra sought FDA's permission to add the treatment of cardiac arrythmias as a new indication, but FDA denied that request.  After further meetings and correspondence, Astra

agreed to submit a separate NDA for the cardiac use of Xylocaine.  The resulting Astra application, NDA 016801, was approved for Xylocaine on October 6, 1969.

71.    Around that time, there were at least a dozen manufacturers selling generic copies of Xylocaine without an NDA.  Invenex Laboratories ("Invenex") was one of those generic drug manufacturers.  Prior to the DESI program, Invenex marketed generic lidocaine without submitting any application to FDA.  Following FDA's DESI announcement for lidocaine, Invenex filed ANDA 080404 for its generic lidocaine injections in May 1971, which FDA approved in December 1971.  But because the DESI proceeding had only evaluated the anesthetic use of lidocaine, FDA's approval of ANDA 080404 did cover cardiac use.

72.    In March 1974, Invenex filed NDA 017584 to obtain FDA's permission to add the new cardiac indication for its preexisting generic lidocaine injection.  FDA approved NDA 017584 on March 26, 1976.

73.    NDA 017584 was a literature-based, "paper NDA" because it contained no preclinical or clinical studies and relied instead on a bibliography of published reports and clinical experience.  FDA's review confirmed as much.  No new data had been submitted because "long and widespread use of this drug . . . may be considered to have established the safety and effectiveness of lidocaine hydrochloride for this indication." *See* FDA, Pharmacologist Review of NDA 17-584, at 1 (July 28, 1975).  FDA's approval was "based on long and wide-spread clinical use of this drug" which "ha[d] been used for the management of cardiac arrythmias of ventricular origin for approximately 10 years" and was "considered generally recognized as safe and effective for the labeled indications based upon a plethora of published reports." *See* FDA, Summary for Basis of Approval of NDA 17-584, at 2 (Dec. 15, 1975).

74.     Each formulation of lidocaine injection approved pursuant to NDA 017584 was a duplicate of a Xylocaine formulation previously approved by FDA.  Indeed, when FDA published the first version of the Orange Book in 1980, it listed Invenex's products as therapeutically equivalent to Xylocaine, thereby confirming that they are duplicates.

75.     The lidocaine injections marketed pursuant to NDA 017854 did not receive any form of regulatory exclusivity.  They have never been covered by any patent.  At all times since 1976, they have been unbranded and marketed as generic.

76.     Invenex was acquired by LyphoMed, Inc. in 1985, which was in turn acquired by Fujisawa Pharmaceutical Company ("Fujisawa") in 1989.  In 1998, a subsidiary of Abraxis acquired Fujisawa's generic drug business.  In 2007, Abraxis spun off its sterile injection business as APP, which was acquired by Fresenius Kabi in 2008.

### 3.     Bupivacaine hydrochloride (NDA 018304)

77.     Bupivacaine hydrochloride (NDA 018304) is not an innovator drug under any version of the MDRP statute because NDA 018304 was not an "original NDA" and because it sought approval for a generic duplicate of the pioneer drug, Marcaine.

78.     Bupivacaine was discovered in the 1950s by a Swedish chemist who worked at AB Bofors ("Bofors").  Bofors quickly launched bupivacaine as a local anesthetic drug in Europe and other ex-U.S. jurisdictions under the name "Marcaine®."

79.     In the United States, Bofors partnered with Sterling-Winthrop, Inc. ("Sterling") to develop Marcaine.  Sterling conducted the clinical trials needed to generate substantial evidence of effectiveness for bupivacaine.  Sterling submitted and then resubmitted NDA 016964 for Marcaine in 1970 and 1971 respectively, and FDA approved Marcaine in 1972.

80.     As a result of patents owned by Bofors, Sterling enjoyed a monopoly on bupivacaine in the United States from 1972 through at least 1978.

81.    In April 1973—after Marcaine had been developed, approved, and launched in the United States—Bofors sold most of its pharmaceutical business to Astra.  The sale did not include, however, the rights to Marcaine in the United States.  Those rights remained with Bofors and Sterling, and later, its subsidiaries.

82.    The last patent protecting Marcaine expired in 1977.  Also, that year FDA announced that it was interpreting section 505(b) of the FDCA to allow sponsors to submit NDAs that relied entirely on literature as substantial evidence of efficacy.  *See, e.g.*, 42 Fed. Reg. 21847, 21852 (Apr. 29, 1977) ("The applicant may be able to include in its applications published articles and other publicly available data and information that provide an adequate basis for the agency's making the evaluation and approvability decision required under section 505.  An NDA can be approved on such a submission.").

83.    Expiration of the Marcaine patents and FDA's paper NDA policy made it possible to market duplicates of Marcaine in the United States.  FDA approved the first generic bupivacaine product (NDA 018053) in April 1978.  Two years later, in 1980, the first edition of the *Orange Book* identified the bupivacaine products marketed by Sterling and Abbott as therapeutic equivalents (and thus duplicates of each other).

84.    Astra also sought to compete with Sterling.  Astra filed NDA 018304 (the one at issue here) for bupivacaine in May 1979.  Astra's application relied solely on published literature; FDA's reviewers described it as "an unusually well prepared and detailed summary of the world literature."  FDA approved NDA 018304 in December 1981.  FDA's review confirmed that approval of Astra's bupivacaine was based on (1) literature and (2) the agency's prior approvals of other bupivacaine products, including Marcaine.  FDA also specifically recognized that Astra's product was not an innovator drug and mandated that "[p]romotion of this product must not convey

the impression that the drug is a new entity." In 1982, FDA also deemed Astra's product to be therapeutically equivalent to both Marcaine and generic bupivacaine.

85.    Astra elected to market its generic bupivacaine product as "Sensorcaine." Following the Hatch-Waxman Amendments in 1984, FDA regulated Sensorcaine as a generic drug, approved several new formulations of Sensorcaine, and approved a series of seven ANDAs for different Sensorcaine vials between May 1986 and April 1987.

86.    The rights to Sensorcaine passed to AstraZeneca in 1999, to Abraxis in 2006, to APP in 2007, and to Fresenius Kabi in 2008.

87.    Sensorcaine did not receive any form of regulatory exclusivity. Sensorcaine has never been covered by any patent.

### 4.    Indomethacin (NDA 022536)

88.    Indomethacin marketed under NDA 022536 is not an innovator drug under any version of the MDRP statute because NDA 022536 was not an "original NDA" and because it sought approval for a generic duplicate of the pioneer drug, Indocin.

89.    Indomethacin is a cardiovascular drug used in premature infants to treat a life-threatening heart condition. Indomethacin was discovered in 1963 and was first approved by FDA in 1965. Intravenous indomethacin was first approved by FDA in 1985 as Indocin® IV ("Indocin") pursuant to NDA 018878.

90.    Indomethacin remained a single source drug until 2010. Indomethacin entered shortage in 2009 when the sponsor of Indocin encountered manufacturing difficulties.

91.    In 2009, Fresenius Kabi submitted an application for a generic indomethacin injection. The application identified Indocin as the reference listed drug and relied entirely on FDA's prior finding that Indocin was safe and effective. The application also did not include bioequivalence studies because FDA granted a biowaiver under 21 C.F.R. § 320.22.

92.     As explained in the application, Indocin "uses Indomethacin Sodium to make the finished product," but Fresenius Kabi's generic had to use the base form of indomethacin "since the sodium salt is not available."  To account for the change from the sodium salt to the base form of indomethacin, Fresenius Kabi included additional excipients to maintain pH and ensure that the generic was bioequivalent to Indocin.

93.     FDA's approval memoranda for Fresenius Kabi's generic indomethacin is less than half a page long.  FDA confirmed that Fresenius Kabi's use of a buffer to maintain pH and equivalence with the salt forms of indomethacin required Fresenius Kabi to submit a section 505(b)(2) application rather than an ANDA.

94.     FDA approved Fresenius Kabi's indomethacin (NDA 022536) in March 2010, which helped to end the shortage of Indocin.

95.     Fresenius Kabi's indomethacin did not receive any form of regulatory exclusivity. It has never been covered by any patent.  At all times since 2010, it has been unbranded and marketed as a generic.

### 5.     Tobramycin (NDA 050789)

96.     Tobramycin marketed under NDA 050789 is not an innovator drug under any version of the MDRP statute because NDA 050789 was not an "original NDA" and because it sought approval for a generic duplicate of the pioneer drug, Nebcin.

97.     Tobramycin is an antibiotic used to fight bacterial infections.  The pioneer version is known as Nebcin and was approved by FDA in 1979 pursuant to NDA 050519.

98.     APP submitted an ANDA for generic tobramycin in 2001.  However, FDA refused to accept the ANDA because APP proposed to use tert-butyl alcohol ("TBA") as a solvent during manufacturing, and a small amount (no more than 1.1% by weight) remained in the finished drug

as an excipient.  FDA reasoned that the presence of TBA as an excipient meant that APP would have to file a section 505(b)(2) application.

99.    APP resisted that conclusion.  APP argued that the TBA should be considered an "impurity" rather than an "excipient" or "inactive ingredient."  Under that view, APP remained entitled to file an ANDA for tobramycin.

100.    APP and FDA reached an agreement in January 2002.  APP agreed to submit a section 505(b)(2) application.  In return, FDA agreed (among other things) that (a) APP's generic tobramycin would be considered equivalent to Nebcin; (b) no clinical studies would be required; and (c) no bioequivalence or bioavailability studies would be needed.

101.    APP submitted its section 505(b)(2) application (NDA 050789, the one at issue here) in December 2002, which relied entirely on FDA's prior finding that Nebcin is safe and effective.

102.    FDA's review memoranda referred to APP's tobramycin injection as a "generic" that was "essentially identical" to "the innovator" (Nebcin).

103.    FDA approved APP's tobramycin on July 13, 2004.

104.    Fresenius Kabi acquired APP in 2008.

105.    Fresenius Kabi's tobramycin did not receive any form of regulatory exclusivity. Fresenius Kabi's tobramycin has never been covered by any patent.  At all times since 2004, Fresenius Kabi's tobramycin has been unbranded and marketed as a generic.

### 6.    Argatroban (NDA 201811)

106.    Argatroban marketed under NDA 201811 is not an innovator drug under any version of the MDRP statute because NDA 201811 was not an "original NDA" and because it sought approval for a generic duplicate of the pioneer drug, Acova™.

107.    Argatroban is an anticoagulant used to prevent blood clots in adults.  It was discovered in the 1980s.  The pioneer version of argatroban in the United States was known as Acova (NDA 020883) and was approved by FDA in 2000.

108.    Acova was subject to a formulation patent through 2014, which prevented ANDAs for generic versions of argatroban.  The formulation patent covered the use of a certain combination of excipients (water, ethanol, and sorbitol) with argatroban.

109.    In light of the patent, Fresenius Kabi and three other generic drug manufacturers developed formulations of argatroban using different excipients.  To enable the excipient changes, all four manufacturers submitted section 505(b)(2) applications for generic argatroban.

110.    Fresenius Kabi submitted its section 505(b)(2) application (NDA 201811) to FDA in April 2010.  The application proposed to use propylene glycol as the only excipient.  The application contained no new studies of any kind and requested a biowaiver.

111.    FDA granted the biowaiver and approved NDA 201811 in 2015.  Approval was delayed through several review cycles due to manufacturing issues.

112.    At the time it was approved, Fresenius Kabi's generic argatroban was the eighth version of argatroban approved in the United States.  FDA determined in the 2016 edition of the Orange Book that Fresenius Kabi's product was therapeutically equivalent to four of the preexisting argatroban products.

113.    Fresenius Kabi's argatroban did not receive any form of regulatory exclusivity.  Fresenius Kabi's argatroban has never been covered by any patent.  At all times since 2015, Fresenius Kabi's argatroban has been unbranded and marketed as a generic.

### 7.    Glucagon for Injection (NDA 201849)

114.    Glucagon marketed under NDA 201849 is not an innovator drug under any version of the MDRP statute because NDA 201849 was not an "original NDA" and because it sought approval for a generic duplicate of the pioneer drug, GlucaGen.

115.    Glucagon is a naturally occurring peptide hormone that was discovered in the 1920s.  It is a complex macromolecule consisting of 29 amino acids with a molecular weight of 3485 Daltons.  It is used in emergency medicine to treat severe hypoglycemia (low blood sugar) in diabetes patients treated with insulin who have passed out or cannot take some form of sugar by mouth.

116.    Originally, glucagon was derived from animals (pigs and cows) and was marketed pursuant to NDA 012122, which took effect in 1960.  In 1968, FDA concluded that animal-based glucagon was "effective" through the DESI program.

117.    In June 1988, FDA approved a recombinant version of glucagon called GlucaGen (NDA 020918).

118.    In the mid-2000s, a division of Abraxis (Abraxis Pharmaceutical Products) sought to develop a generic competitor to GlucaGen.  Due to the complexities of recombinant production, FDA generally does not accept ANDAs for generic drugs of recombinant origin (even today).  *See FDA Guidance for Industry:  ANDAs for Certain Highly Synthetic Peptide Drugs Products That Refer to Listed Drugs of rDNA Origin*, at 1 n.2 (May 2021).  Abraxis Pharmaceutical Products therefore developed a synthetic version of glucagon and filed ANDA 079048 for generic glucagon in September 2007, relying on recombinant GlucaGen as the reference listed drug.

119.    In December 2007, FDA refused to accept the ANDA, explaining that, at the time, FDA considered protein products manufactured by synthetic or recombinant means to be

pharmaceutical alternatives, and that ANDAs were only appropriate for pharmaceutical equivalents. FDA recommended that APP submit a section 505(b) NDA for generic glucagon.

120.    Then, in February 2008 after Abraxis Pharmaceutical Products split from Abraxis and was then operating under the APP name, APP amended the ANDA to include results from an outside laboratory it had contracted with to perform amino acid sequencing and molecular weight analyses. According to APP, the results confirmed that both the amino acid sequence and molecular weight of generic glucagon were identical to the GlucaGen reference listed drug. APP also explained that FDA had previously approved other drugs containing synthetic peptides.

121.    In April 2008, FDA again refused to accept the ANDA, citing the same reasoning provided in its December 2007 letter.

122.    In August 2008, APP requested a meeting with FDA to discuss the refusal to accept the generic glucagon ANDA, which FDA denied in October of that year and recommended that APP file a 505(b)(2) application for generic glucagon.

123.    APP then in April 2009 requested that FDA withdraw the generic glucagon ANDA, which FDA withdrew the next month.

124.    As instructed by FDA, APP submitted a section 505(b)(2) application (NDA 201849, the one at issue here) for generic, synthetic glucagon in 2010. The application relied on FDA's previous findings of safety and effectiveness for GlucaGen. The two products have the same strength, dosage form, route of administration, active ingredients, and inactive ingredients. The products differ only in method of manufacture. To show that synthetic manufacturing did not raise any significant questions of safety or efficacy, Fresenius Kabi conducted a single bioequivalence study comparing its generic to the innovator.

125.    FDA approved Fresenius Kabi's generic glucagon in 2015.

126.    Following its experience reviewing Fresenius Kabi's application, FDA revised its policy regarding generic peptides.  The agency issued a draft guidance in 2017 in which FDA recognized that, "[i]n the past, analytical methods have not always been capable of adequately characterizing peptide products for submission in an ANDA." *FDA Draft Guidance for Industry: ANDAs for Certain Highly Purified Synthetic Peptide Drug Products That Refer to Listed Drugs of rDNA Origin*, at 2 (Dec. 2017).  But FDA announced that it "now believes it is possible" to accept an ANDA for a synthetic, generic version of five reference listed drugs that are peptides of recombinant origin.  *Id.* at 2–3.  One of the five reference listed drugs identified in the draft guidance was recombinant glucagon.  *See id.* at 1.  The draft guidance was finalized without material change in 2021.  *See FDA Guidance for Industry:  ANDAs for Certain Highly Synthetic Peptide Drugs Products That Refer to Listed Drugs of rDNA Origin* (May 2021).

127.    Fresenius Kabi's glucagon did not receive any form of regulatory exclusivity.  Fresenius Kabi's glucagon has never been covered by any patent.  At all times since 2015, Fresenius Kabi's glucagon has been unbranded and marketed as a generic.

**8.    Moxifloxacin (NDA 205572)**

128.    Moxifloxacin marketed under NDA 205572 is not an innovator drug under any version of the MDRP statute because NDA 205572 was not an "original NDA" and because it sought approval for a generic duplicate of the pioneer drug, Avelox.

129.    Moxifloxacin is an antibiotic that fights bacteria in the body, including pneumonia.  It was discovered in approximately 1991.  The pioneer version of moxifloxacin was approved in tablet form in 1999 and was referred to as Avelox (NDA 021085 and 021334).  Avelox was approved as an injection in 2001 under NDA 021277.

130.    Avelox received five years of regulatory exclusivity and was protected by patents that were upheld in court.  As an injection, Avelox was covered by patent running through 2020,

which claimed an aqueous formulation comprising moxifloxacin hydrochloride and sodium chloride.

131.    Because of the patent, Fresenius Kabi developed a generic version of moxifloxacin that used different excipients than Avelox.  Specifically, Fresenius Kabi proposed to substitute sodium acetate trihydrate and disodium sulfate for the sodium chloride used to adjust tonicity in Avelox.  Those new excipients required Fresenius Kabi to submit a section 505(b)(2) application (NDA 205572) for its generic moxifloxacin.  But the excipient changes also allowed Fresenius Kabi to avoid patent litigation.

132.    FDA approved NDA 205572 (the one at issue here) for Fresenius Kabi's moxifloxacin on April 3, 2015, five years before the Avelox patent expired.  FDA's review confirmed that Fresenius Kabi's moxifloxacin is a generic duplicate of Avelox.  Among other things, FDA (a) granted a biowaiver, meaning the application did not contain any bioavailability or bioequivalence studies; (b) confirmed that the section 505(b)(2) application contained no new clinical or statistical information; and (c) recognized that "the human physiological disposition of the proposed drug product does not differ from that of the listed drug product."

133.    Fresenius Kabi's moxifloxacin did not receive any form of regulatory exclusivity. Fresenius Kabi's moxifloxacin has never been covered by any patent.  At all times since 2015, Fresenius Kabi's moxifloxacin has been unbranded and marketed as a generic.

### 9.    Tigecycline (NDA 205645)

134.    Tigecycline marketed under NDA 205645 is not an innovator drug under any version of the MDRP statute because NDA 205645 was not an "original NDA" and because it sought approval for a generic duplicate of the pioneer drug, Tygacil.

135.    Tigecycline is an antibiotic used to treat bacterial infections in the skin or digestive system.  It was discovered in 1999, and the pioneer version was first approved by FDA in 2005 and was known as Tygacil (NDA 021821).

136.    Tygacil received five years of regulatory exclusivity when it was approved.  It also was covered by a formulation patent claiming "a composition comprising tigecycline, lactose, and an acid selected from hydrochloric acid and gentisic acid."  The patent ran through 2029.

137.    Fresenius Kabi developed a generic version of tigecycline using different excipients.  Specifically, Fresenius Kabi proposed to substitute arginine for lactose.  The excipient change required a section 505(b)(2) application under FDA's rules.

138.    Fresenius Kabi submitted its section 505(b)(2) application for generic tigecycline (NDA 205645) in 2013.  The sponsor of Tygacil filed a patent infringement suit, but the litigation settled in November 2015, which cleared the way for Fresenius Kabi to market generic tigecycline.

139.    FDA approved NDA 205645 (the one at issue here) in December 2016.

140.    FDA's review confirmed that Fresenius Kabi's tigecycline is a generic duplicate of Tygacil.  FDA did not require NDA 205645 to include any clinical studies, any new clinical microbiology information, any new clinical pharmacology information, or any new clinical or statistical information.  FDA also granted a biowaiver and confirmed that Fresenius Kabi's product "contains the same active pharmaceutical ingredient, tigecycline, to be administered as a solution of the same dosage strength and at the same dose as that of the RLD.  The only difference with the RLD is the substitution of L-arginine for lactose monohydrate . . . ."

141.    When it approved Fresenius Kabi's tigecycline in December 2016, FDA concluded that it was therapeutically equivalent to the pioneer drug, Tygacil.

142.    Fresenius Kabi's tigecycline did not receive any form of regulatory exclusivity. Fresenius Kabi's tigecycline has never been covered by any patent.  At all times since 2016, Fresenius Kabi's tigecycline has been unbranded and marketed as a generic.

## PROCEDURAL BACKGROUND

### A.    Fresenius Kabi's Requests for Classification of Certain Drugs

143.    On November 22, 2016 and December 28, 2016, Fresenius Kabi submitted requests to CMS seeking classification of certain drugs (including those discussed above) as non-innovator multiple source drugs under the MDRP.  On January 23, 2020, Fresenius Kabi supplemented and updated those requests.

144.    Fresenius Kabi requested that CMS "confirm that the drugs discussed herein are not 'original NDAs' for purposes of the Medicare Drug Rebate Program ('MDRP')."  *See* Fresenius Kabi, Request for Exception Consideration at 1 (Nov. 22, 2016) ("FK Request"). Fresenius Kabi explained that "the plain language of the term 'original NDA,' as used in section 1927(k)(7)(A) of the Social Security Act, limits those drugs that are required to result in innovator rebates to the first such drug approved for the active ingredient."  *Id.* at 1 n.1 (citing Fresenius Kabi USA, LLC, Comments to Docket No. CMS-2345-FC (Apr. 1, 2016) ("FK Comments")). CMS's decision "to treat any drug approved under [an NDA] as an 'innovator' for purposes of the MDRP . . . is contrary to the plain language of the statute and its reference to an 'original new drug application.'"  *See* FK Comments, at 1.  "[T]he statute specifically refer[s] to an 'original new drug application' when describing those drugs subject to rebate calculations at the branded rate[,]" and "[b]y using the word 'original' as a modifying adjective to 'new drug application', Congress intended only to include the first, or 'original', new drug application, not subsequent new drug applications for the same drug[.]"  *Id.* at 2.

145.    Additionally, Fresenius Kabi submitted that "CMS has previously interpreted the statute in effectively this manner" and that "the Administrative Procedures Act does not permit a regulatory agency to disregard the plain language of a statute." *Id.* at 2–3.

146.    Fresenius Kabi further explained that the 2016 Final Rule "effectively eliminates the word 'original' from the statutory text." *Id.* at 3. Fresenius Kabi thus asserted in its request that the CMS Guidance was inconsistent with the plain language of the statute, and therefore "inconsistent with the Administrative Procedures Act (APA)." FK Request at 1 n.1. Fresenius Kabi also explained that even, under CMS's extra-statutory approach, "the drugs identified" in its request "are properly treated as non-innovators under CMS Guidance." *Id.*

**B.    CMS's Decisions and Fresenius Kabi's Responses.**

147.    In a series of letters issued in 2023, CMS rejected Fresenius Kabi's requests to classify these drugs as non-innovator, multiple source drugs. Fresenius Kabi submitted timely response to each of CMS's rejection letters.

**1.    Lidocaine hydrochloride (NDA 006488 and NDA 017584)**

148.    On January 19, 2023, CMS rejected Fresenius Kabi's request to classify its lidocaine injections as non-innovator drugs. *See* Letter from C. Denemark, CMS, to C. Elkins, Fresenius Kabi re: Lidocaine & Xylocaine (Jan. 19, 2023).

149.    CMS did not address the pre-2019 version of the MDRP statute and addressed only its narrow exception policy.

150.    CMS classified lidocaine injections marketed as Xylocaine pursuant to NDA 006488 as innovator drugs. CMS relied solely on the fact that, 75 years earlier, Xylocaine had been a pioneer drug protected by patent. *Id.* at 3–4. CMS did not address the fact that Xylocaine came to market more than a decade before Congress mandated FDA approval and, therefore, was not originally marketed under an approved NDA.

151.    CMS also classified generic lidocaine injections marketed pursuant to NDA 017584 as innovator drugs.  CMS did not acknowledge that NDA 017584 had been filed in 1974 to obtain FDA's approval to add a new cardiac indication to existing generic lidocaine injections that originally had been marketed without any application and had been approved in 1971 pursuant to an ANDA submitted in response to a DESI notice.  Nor did CMS acknowledge that every injection covered by NDA 017584 was a generic duplicate of a formulation that FDA had previously approved as Xylocaine in NDA 006488 in 1948 or NDA 016801 in 1969.

152.    Rather than confront those facts—all part of the public record—CMS relied on counterfactual speculation.  CMS hypothesized that if NDA 017584 had been filed at some point after the Hatch-Waxman Amendments of 1984 (rather than 1974), it would have been classified as a section 505(b)(2) application rather than an ANDA.  *See id.* at 5.  CMS based its speculation on a pair of factually inaccurate assertions.  CMS first claimed that NDA 017584 was not a "literature-based 'paper' NDA," *id.*, even though it obviously was (as confirmed by FDA's review).  Second, CMS claimed that NDA 017584 "was not submitted . . . for approval as a 'generic' version, or a 'me-too' version of a previously approved drug," *id.*, even though NDA 017584 sought and obtained FDA's approval for generic duplicates of Xylocaine formulations approved in earlier applications.  And CMS claimed that Fresenius Kabi's generic lidocaine "had not been previously marketed" prior to NDA 017584, *id.*, thereby ignoring that these lidocaine products had been marketed by Invenex since before the DESI program without submitting an application to FDA and after the DESI program pursuant to an ANDA.

153.    Finally, CMS rejected as irrelevant that FDA determined Fresenius Kabi's generic lidocaine to be therapeutically equivalent to Xylocaine.  *Id.* at 6.

154.    CMS offered Fresenius Kabi an opportunity to respond to its decision within 30 days.  *Id.* at 6.  On February 17, 2023, Fresenius Kabi submitted a response disagreeing with CMS.  *See* Letter from S. Chowdhury, Fresenius Kabi to C. Denemark, CMS, at 1 (Feb. 17, 2023).  Fresenius Kabi provided additional information to CMS on May 24, 2024.  *See* Letter from S. Griffin, Sidley Austin to C. Denemark, CMS (May 24, 2024).

### 2.    Bupivacaine hydrochloride (NDA 018304)

155.    On March 15, 2023 (as corrected on May 9, 2023), CMS rejected Fresenius Kabi's request to classify its bupivacaine injections as non-innovator drugs.  *See* Letter from C. Denemark, CMS to C. Elkins, Fresenius Kabi re:  Bupivacaine (Mar. 15, 2023); Letter from C. Denemark, CMS to C. Elkins, Fresenius Kabi re:  Bupivacaine (May 9, 2023) (correction to original letter dated March 15, 2023).

156.    CMS did not address the pre-2019 version of the MDRP statute and addressed only its narrow exception policy.

157.    CMS classified the bupivacaine injections marketed as Sensorcaine pursuant to NDA 018304 as innovator drugs.  CMS offered three reasons for its determination.  First, CMS erroneously attributed the patents that had covered the pioneer drug (Marcaine) through 1977 to generic drugs that were not approved until 1981 because CMS failed to understand the fact that Astra never had rights to Marcaine in the United States.  *See id.* at 3.  Second, CMS purported to deny that NDA 018304 was "approved under FDA's paper NDA policy[,]" *id.* at 4, even though FDA's own review had described the application as an unusually well prepared and detailed summary of the world literature.  Third, CMS rejected as irrelevant the fact that FDA deemed the drugs marketed pursuant to NDA 018304 to be therapeutically equivalent to both Marcaine and other, earlier generics.  *See id.* at 5.

158.    CMS offered Fresenius Kabi an opportunity to respond to its decision within 30 days.  *Id.*  On April 14, 2023, Fresenius Kabi submitted a response disagreeing with CMS.  *See* Letter from C. Elkins, Fresenius Kabi to C. Denemark, CMS (Apr. 14, 2023).  Fresenius Kabi provided additional information to CMS on March 13, 2024.  *See* Letter from S. Griffin, Sidley Austin to C. Denemark, CMS (Mar. 13, 2024).

### 3.    Indomethacin (NDA 022536)

159.    On May 15, 2023, CMS rejected Fresenius Kabi's request to classify its generic indomethacin injections as non-innovator drugs.  *See* Letter from C. Denemark, CMS to C. Elkins, Fresenius Kabi re:  Indomethacin (May 15, 2023).

160.    CMS did not address the pre-2019 version of the MDRP statute and addressed only its narrow exception policy.

161.    CMS conceded that NDA 022536 relied on FDA's prior approval of the pioneer drug (Ovation Pharmaceutical's Indocin IV) to show safety and efficacy.  *See id.* at 3.  CMS nevertheless classified generic indomethacin as an innovator drug because the change from the sodium salt to the base form of indomethacin required different excipients and, therefore, required a section 505(b)(2) application under FDA's excipient rule.  *See id.* at 3–4.

162.    In reaching that conclusion, CMS ignored its own guidance that a generic drug should be classified as a non-innovator where an NDA is required for "technical reasons."  *See* CMS Manufacturer Release No. 98 at 1 (May 2, 2016).  CMS also ignored Congress's determination that generic injectables that require an NDA because of FDA's excipient rule should still be considered generic drugs that are eligible for automatic substitution at the point of dispensing.  *See* 21 U.S.C. § 355(j)(7)(A)(v)(I).

163.    CMS also ignored that Fresenius Kabi had developed an alternative formulation using the base substance because Indocin was in shortage, and the sodium salt of indomethacin

was not available.  Changing formulations made it possible to bring a generic version to market, helped alleviate the shortage, and ensured that this important medicine was available to patients in the United States.

164.    CMS offered Fresenius Kabi an opportunity to respond to its decision within 30 days.  On June 13, 2023, Fresenius Kabi submitted a response disagreeing with CMS.  *See* Letter from C. Elkins, Fresenius Kabi to C. Denmark, CMS (June 13, 2023).

**4.    Tobramycin (NDA 050789)**

165.    On May 15, 2023, CMS denied Fresenius Kabi's request to classify generic tobramycin injection as a non-innovator drug.  Letter from C. Denmark, CMS to C. Elkins, Fresenius Kabi re:  Tobramycin (May 15, 2023).

166.    CMS did not address the pre-2019 version of the MDRP statute and addressed only its narrow exception policy.

167.    CMS conceded that NDA 050789 relied on FDA's prior approval of the pioneer drug (Nebcin) to show safety and efficacy.  *See id.* at 3.  CMS further conceded that FDA had identified Nebcin as the "innovator product" for tobramycin.  *See id.* at 5.

168.    CMS nevertheless classified generic tobramycin as an innovator drug because it allegedly had "different ingredients" than the reference listed drug.  *Id.* at 3.  CMS mistakenly concluded that generic tobramycin and Nebcin contain different *active* ingredients—it concluded that "Fresenius Kabi's product contains another ingredient that is not considered inactive."  *Id.* at 4.  That double negative reflects a fundamental misunderstanding by CMS.  To try to avoid the application of FDA's excipient rule, APP had argued that the small amount of TBA present in the generic drug should be considered an impurity because it was a residue from the manufacturing process and therefore should not be considered an inactive ingredient / excipient.  *See* ¶¶ 96–99, *supra*.  FDA rejected that argument, but *contra* CMS, FDA clearly and repeatedly recognized that

generic tobramycin and Nebcin contain the same active ingredients and are identical except for the presence of TBA. *See* ¶¶ 100–03, *supra.*

169.    CMS's reliance on the excipient rule to classify generic tobramycin as an innovator ignored its own guidance that a generic drug should be classified as a non-innovator where an NDA is required for "technical reasons." *See* CMS Manufacturer Release No. 98 at 1 (May 2, 2016). It also ignored Congress's determination that generic injectables that require an NDA because of FDA's excipient rule should still be considered generic drugs that are eligible for automatic substitution at the point of dispensing. *See* 21 U.S.C. § 355(j)(7)(A)(v)(I).

170.    CMS also rejected as irrelevant the fact that FDA had determined that generic tobramycin is therapeutically equivalent to Nebcin.

171.    CMS offered Fresenius Kabi an opportunity to respond to its decision within 30 days. On June 13, 2023, Fresenius Kabi submitted a response disagreeing with CMS. *See* Letter from C. Elkins, Fresenius Kabi to C. Denmark, CMS (June 13, 2023).

### 5.    Argatroban (NDA 201811)

172.    On May 15, 2023, CMS denied Fresenius Kabi's request to classify generic argatroban injection (NDA 201811) as a non-innovator drug. Letter from C. Denmark, CMS, to C. Elkins, Fresenius Kabi re:  Argatroban (May 15, 2023).

173.    CMS did not address the pre-2019 version of the MDRP statute and addressed only its narrow exception policy.

174.    CMS conceded that the "basis for submission" for NDA 201811 was FDA's prior approval of Acova. *See id.* at 3–4. CMS further conceded that FDA had identified Acova as the "innovator product" for argatroban. *See id.* at 5.

175.    CMS nevertheless classified generic argatroban as an innovator drug because it "uses dehydrated alcohol and D-sorbitol whereas [the reference listed drug] uses propylene

glycol." *Id.* at 4.  CMS observed that this excipient change triggered FDA's excipient rule and the requirement for a section 502(b) application.  *Id.* at 4 n.2.

176.    CMS's reliance on the excipient rule to classify generic argatroban as an innovator ignored its own guidance that a generic drug should be classified as a non-innovator where an NDA is required for "technical reasons."  *See* CMS Manufacturer Release No. 98 at 1 (May 2, 2016).  It also ignored Congress's determination that generic injectables that require an NDA because of FDA's excipient rule should still be considered generic drugs that are eligible for automatic substitution at the point of dispensing.  *See* 21 U.S.C. § 355(j)(7)(A)(v)(I).

177.    CMS also rejected as irrelevant the fact that FDA had determined that generic argatroban is therapeutically equivalent to Acova.

178.    CMS offered Fresenius Kabi an opportunity to respond to its decision within 30 days.  On June 13, 2023, Fresenius Kabi submitted a response disagreeing with CMS.  *See* Letter from C. Elkins, Fresenius Kabi to C. Denmark, CMS (June 13, 2023).

### 6.    Glucagon (NDA 201849)

179.    On May 15, 2023, CMS denied Fresenius Kabi's request to classify generic glucagon injection (NDA 201849) as a non-innovator drug.  Letter from C. Denmark, CMS, to C. Elkins, Fresenius Kabi re:  Glucagon (May 1, 2023).

180.    CMS did not address the pre-2019 version of the MDRP statute and addressed only its narrow exception policy.

181.    CMS conceded that the "basis for submission" for NDA 201849 was FDA's prior approval of GlucaGen.  *See id.* at 4.

182.    CMS nevertheless classified generic glucagon as an innovator drug.  CMS's decision misconstrues FDA policy regarding generic peptides.  First, CMS erroneously asserted that "the 505(j) approval pathway was available," *id.*, for generic glucagon when NDA 201849

was submitted in 2010.  To the contrary, Fresenius Kabi had tried to file an ANDA for its generic glucagon injection, but FDA rejected that application pursuant to a policy that prohibited the use of ANDAs for generic peptides.

183.     Second, CMS erroneously asserted that the manufacturing differences "go beyond what is allowed for an ANDA" today.  *Id.*  That, too, is wrong.  Under the FDA's current policy, the ANDA pathway is available for some generic synthetic peptides, including glucagon.  *See FDA Guidance for Industry:  ANDAs for Certain Highly Synthetic Peptide Drugs Products That Refer to Listed Drugs of rDNA Origin*, at 3–4 (May 2021).

184.     CMS offered Fresenius Kabi an opportunity to respond to its decision within 30 days.  On May 31, 2023, Fresenius Kabi submitted a response disagreeing with CMS.  *See* Letter from C. Elkins, Fresenius Kabi to C. Denemark, CMS (May 31, 2023).

### 7.     Moxifloxacin (NDA 205572)

185.     On May 15, 2023, CMS denied Fresenius Kabi's request to classify generic moxifloxacin injection (NDA 205572) as a non-innovator drug.  *See* Letter from C. Denemark, CMS to C. Elkins, Fresenius Kabi re:  Moxifloxacin (May 15, 2023).

186.     CMS did not address the pre-2019 version of the MDRP statute and addressed only its narrow exception policy.

187.     CMS conceded that the "basis for submission" for NDA 205572 was FDA's prior approval of Avelox.  *See id.* at 4.  CMS further conceded that FDA had identified Avelox as the "innovator product" for moxifloxacin.  *See id.*

188.     CMS nevertheless classified generic moxifloxacin as an innovator drug.  CMS claimed that FDA had denied a biowaiver for Fresenius Kabi's generic moxifloxacin, *id.*, when FDA actually granted a biowaiver for NDA 205572.

189.     CMS also pointed to the fact that generic moxifloxacin used different "inactive ingredients," specifically different "tonicity and pH adjusters[,]" and observed that FDA's excipient rule required a section 505(b)(2) application. *Id.*

190.     CMS's reliance on the excipient rule to classify generic moxifloxacin as an innovator ignored its own guidance that a generic drug should be classified as a non-innovator where an NDA is required for "technical reasons." *See* CMS Manufacturer Release No. 98 at 1 (May 2, 2016). It also ignored Congress's determination that generic injectables that require an NDA because of FDA's excipient rule should still be considered generic drugs that are eligible for automatic substitution at the point of dispensing. *See* 21 U.S.C. § 355(j)(7)(A)(v)(I).

191.     CMS offered Fresenius Kabi an opportunity to respond to its decision within 30 days. On June 13, 2023, Fresenius Kabi submitted a response disagreeing with CMS. *See* Letter from C. Elkins, Fresenius Kabi to C. Denmark, CMS (June 13, 2023).

**8.     Tigecycline (NDA 205645)**

192.     On May 15, 2023, CMS rejected Fresenius Kabi's request to classify generic tigecycline injection (NDA 205645) as a non-innovator drug. *See* Letter from C. Denmark, CMS to C. Elkins, Fresenius Kabi re: Tigecycline (May 15, 2023).

193.     CMS did not address the pre-2019 version of the MDRP statute and addressed only its narrow exception policy.

194.     CMS conceded that the "basis for submission" for NDA 205645 was FDA's prior approval of Tygacil. *See id.* at 3. CMS further conceded that FDA had identified Tygacil as the "innovator product" for moxifloxacin. *See id.* at 4.

195.     CMS nevertheless classified generic tigecycline as an innovator drug. CMS relied on the fact that generic tigecycline differed from Tygacil "in that it contained arginine as an

excipient" and FDA's excipient rule, which had required the submission of section 505(b)(2) application.  *Id.*

196.    CMS's reliance on the excipient rule to classify generic tigecycline as an innovator ignored its own guidance that a generic drug should be classified as a non-innovator where an NDA is required for "technical reasons."  *See* CMS Manufacturer Release No. 98 at 1 (May 2, 2016).  It also ignored Congress's determination that generic injectables that require an NDA because of FDA's excipient rule should still be considered generic drugs that are eligible for automatic substitution at the point of dispensing.  *See* 21 U.S.C. § 355(j)(7)(A)(v)(I).

197.    CMS offered Fresenius Kabi an opportunity to respond to its decision within 30 days.  On June 13, 2023, Fresenius Kabi submitted a response disagreeing with CMS.  *See* Letter from C. Elkins, Fresenius Kabi to C. Denmark, CMS (June 13, 2023).

*        *        *        *

198.    On January 3, 2024, Fresenius Kabi informed CMS that it was awaiting a response as to the classifications of the generic injectables discussed above.  Fresenius Kabi explained that absent a response within two additional months, Fresenius Kabi would consider its requests to have been denied and final, and reserved the right to seek further relief related to those denials.  *See* Letter from C. Elkins, Fresenius Kabi to C. Denmark, CMS, at 1–2 (Jan. 3, 2024).

199.    On February 20, 2024, CMS informed Fresenius Kabi that its letters submitted in the first half of 2023 were "currently under review."  *See* E-mail from C. Denmark, CMS to S. Chowdhury, Fresenius Kabi (Feb. 20, 2024).[2]

---

[2] CMS stated that "[d]ue to the volume of requests and the lack of available staff, the review of these requests have resulted in a backlog."  *Id.*  CMS continued that FK "should not infer that CMS has reconsidered its initial decision and approved a narrow exception for its product[s] unless and until CMS issues a written decision on that reconsideration request" and that "[i]f CMS's initial decision changes, that decision would become the new final agency action."  *Id.*

200.    Five months later, on June 12, 2024, Fresenius Kabi again inquired about the status of its requests.  On June 17, 2024, CMS responded that it had received Fresenius Kabi's request and that it would get back to Fresenius Kabi.  Now, more than eight months later, Fresenius Kabi still has not received any further response from CMS concerning the status of the generic injections at issue here.

## COUNT I

**Defendants' Refusal to Classify These Generic Injections As Non-Innovator Multiple Source Drugs Is Not In Accordance With Law and Exceeds Their Statutory Authority.**

201.    Plaintiff incorporates by reference all allegations contained in the preceding paragraphs.

202.    CMS's refusal to classify these generic injections as non-innovator multiple source drugs is "final agency action for which there is no other adequate remedy."  5 U.S.C. § 704; *Bennett*, 520 U.S. at 177–78 (explaining that agency action is final if it (1) "mark[s] the 'consummation' of the agency's decisionmaking process" and (2) determines "rights or obligations" or causes "legal consequences [to] flow").  The CMS decisions refusing to classify these generic injections as non-innovators reflect the consummation of the agency's decisionmaking process and determine Fresenius Kabi's legal rights and financial liabilities under the MDRP.

203.    Although Fresenius Kabi submitted responses to the CMS decisions, those submissions do not render the CMS decisions non-final.  Under the APA, an action remains final regardless of whether the regulated entity has sought "any form of reconsideration" unless (a) reconsideration is required "by rule"; (b) the agency "provides that the action meanwhile is inoperative"; and (c) the agency provides an avenue for "appeal to superior agency authority."  5 U.S.C. § 704.  None of those conditions is satisfied here.

43

204.    CMS's refusal to respond to Fresenius Kabi's submissions further is a constructive denial of Fresenius Kabi's request to classify these drugs as non-innovators.  *See Her Majesty the Queen*, 912 F.2d at 1531 ("[A]gency inaction may represent effectively final agency action that the agency has not frankly acknowledged"); *Environmental Defense Fund*, 428 F.2d at 1098–99 ("exigent circumstances" may "render" an agency's "failure to act . . . equivalent to a final denial" such that "administrative inaction has precisely the same impact on the rights of the parties as denial of relief"); *Friedman*, 841 F.3d at 541 (concluding that agency conduct was "a constructive denial" because the agency "ha[d] made up its mind" even in the absence of a "formal acknowledgement").

205.    The APA allows a person suffering a wrong or adversely affected by an agency action to receive judicial review of the agency's action.  5 U.S.C. § 702.  The APA proscribes agency action that is in excess of statutory authority and "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id*. § 706(2)(A), (C).

206.    These generic injections qualify as non-innovator, multiple source drugs under the plain language of section 1927 of the SSA as it existed prior to amendment by Congress on April 18, 2019.  As a result, CMS's classification of them as innovator multiple source drugs for the period before April 18, 2019 is in excess of statutory authority and "otherwise not in accordance with law."  5 U.S.C. § 706(2)(A), (C).

207.    CMS's arguments to the contrary were rejected in the *STI Pharma* case.  CMS has ignored the plain language, the structure, and the purpose of the pre-2019 version of section 1927, each of which confirms that the Fresenius Kabi drugs at issue are non-innovator multiple source drugs.  Foremost, none of the drugs at issue were "originally marketed under an original new drug application approved by" FDA.

208.    The following are all unbranded, generic duplicates of previously approved pioneer drugs:  Fresenius Kabi's (i) lidocaine injections (NDA 017584), (ii) indomethacin injections (NDA 018878), (iii) tobramycin injections (NDA 050789), (iv) argatroban injections (NDA 201811), (v) glucagon injections (NDA 201849), (vi) moxifloxacin injections (NDA 205572), and (vii) tigecycline injections (NDA 205645).  None of these drugs was ever protected by regulatory exclusivity or patent.  Each of these NDAs relied on FDA's approval of the pioneer drug and published literature.  None included any new clinical trials.  None can be considered "an original new drug application."

209.    Fresenius Kabi's bupivacaine injections (NDA 018304) are also duplicates of a previously approved pioneer drug.  Although bupivacaine is a branded product with a trade name (Sensorcaine), it is a generic duplicate of a previously approved pioneer drug (Marcaine).  The bupivacaine injections marketed pursuant to NDA 018304 were never protected by regulatory exclusivity or patent.  The NDA for bupivacaine relied on FDA's approval of Marcaine and published literature and did not include any new clinical trials.  It is not "an original new drug application."

210.    Finally, Fresenius Kabi's lidocaine injections marketed as Xylocaine (NDA 006488) are not innovator drugs because they were not "originally marketed" under an application that was "approved" by FDA.  NDA 006488 was submitted in 1948 and "took effect" automatically through the operation of law.  Although the NDA was eventually approved, that did not occur until 1971 following the DESI program.  As the Supreme Court has explained, the 1962 Amendments to the FDCA changed section 505(a) to "require affirmative approval of FDA, where previously it had provided that an NDA would automatically become effective unless a contrary order were issued." *USV Pharm. Corp.*, 412 U.S. at 660–61.

211.    Defendants' classification of these drugs as innovator multiple source drugs and their refusal to classify them as non-innovator multiple source drugs for the period prior to April 18, 2019 is "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(A), (C).

212.    Fresenius Kabi lacks an adequate remedy at law for Defendants' unlawful action.

## COUNT II

**Defendants' Refusal to Classify The Fresenius Kabi Drugs at Issue As Non-Innovator Multiple Source Drugs Under The "Narrow Exception" Is Arbitrary, Capricious and Contrary to Law.**

213.    Plaintiff incorporates by reference all allegations contained in the preceding paragraphs.

214.    The APA allows a person suffering a wrong or adversely affected by an agency action to receive judicial review of the agency's action.  5 U.S.C. § 702.  The APA proscribes agency action that is in excess of statutory authority and "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id*. § 706(2)(A), (C).  Agency action is arbitrary and capricious when the agency acts counter to the evidence in the record or when its action lacks a rational connection to the facts of the record.  *See, e.g.*, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43–44 (1983); *Haselwander v. McHugh*, 774 F.3d 990, 998–99 (D.C. Cir. 2014).

215.    CMS's refusal to classify the Fresenius drugs at issue as non-innovators under the agency's narrow exception regulation is arbitrary, capricious, and contrary to law both before and after Congress amended section 1927 of the SSA on April 18, 2019.

216.    As amended by Congress in 2019, section 1927(k)(7)(A) now provides that (i) "the term 'noninnovator multiple source drug' means a multiple source drug that is not an innovator

multiple source drug," and (ii) "term 'innovator multiple source drug' means a multiple source drug marketed under a new drug application approved by the Food and Drug Administration, unless the Secretary determines that a narrow exception applies (as described in Section 447.502 of title 42, Code of Federal Regulations . . . .)." Pub. L. No. 116-16, 133 Stat. 852 § 6(c). The referenced regulation repeats the statutory language without further describing the "narrow exception." *See* 42 C.F.R. § 447.502 ("Innovator multiple source drug means a multiple source drug, including an authorized generic drug, that is marketed under a new drug application (NDA) approved by FDA, unless the Secretary determines that a narrow exception applies (as described in this section).").

217.    In Release No. 98, CMS provided guidance for the application of the "narrow exception," including that "certain drugs approved under [NDAs] might be more appropriately treated as if they were approved under an [ANDA] and classified as noninnovator multiple source drugs." CMS explained that "the goal" of the narrow exception pathway is "to ensure" that generic drugs required NDAs "technical reasons" are properly classified as non-innovator drugs. CMS identified three non-exhaustive examples of categories of generic drugs approved pursuant to NDAs that qualified for a narrow exception. But CMS also stated that narrow exceptions would not be granted to drugs that "received patent protection or statutory exclusivity."

218.    With the exception of the lidocaine injections marketed as Xylocaine (NDA 006844), all of the Fresenius Kabi drugs at issue are generic injections that are properly classified as non-innovator multiple source drugs under the narrow exception regulation. All of those generic injections are follow-on duplicates of pioneer drugs previously approved by FDA. None of them received patent protection or statutory exclusivity, and each was approved pursuant to an NDA for "technical reasons."

219.    Further, the structure and purpose of section 1927 support classifying these drugs as non-innovator multiple source drugs.  Fresenius Kabi should not be required to pay the higher rebates reserved for "innovator" drugs for generic injections.  *See STI Pharma*, 613 F. Supp. 3d at 168–69.  Extracting higher rebates from generic injections also is inconsistent with Congress's recent determination that generic injectables that require an NDA because of FDA's excipient rule should still be considered generic drugs that are eligible for automatic substitution at the point of dispensing.  *See* 21 U.S.C. § 355(j)(7)(A)(v)(I).

220.    Defendants' refusal to classify these drugs as non-innovator drugs is arbitrary and capricious because "[a]n agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so."  *Indep. Petroleum Ass'n v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996); *Kreis v. Sec'y of Air Force*, 406 F.3d 684, 687 (D.C. Cir. 2005).  The "technical reasons" that led FDA to require NDAs for these drugs are materially indistinguishable from the non-exclusive categories of drugs identified by CMS in Release No. 98 as warranting treatment as non-innovator drugs under the narrow exception.

221.    Defendants further failed to engage in reasoned decision-making when they refused to classify Fresenius Kabi's generic injections as non-innovator drugs under the narrow exception. As discussed above, CMS repeatedly based its classification decisions on incorrect factual assertions and/or manifest errors of law

222.    Defendants' refusal to classify these Fresenius Kabi drugs as non-innovator multiple source drugs is arbitrary, capricious, and contrary to law.  5 U.S.C. § 706(2)(A), (C).

223.    Fresenius Kabi lacks an adequate remedy at law for Defendants' unlawful action.

## COUNT III

**Defendants' Refusal to Respond to Fresenius Kabi's Submissions Constitutes Unreasonable Delay and/or Agency Action Unlawfully Withheld**

224.    Plaintiff incorporates by reference all allegations contained in the preceding paragraphs.

225.    To the extent that any of Defendants' actions is deemed not to qualify as final agency action, then Defendants have unlawfully withheld and unreasonably delayed agency action in violation of the APA.  Defendants may not thwart judicial review by withholding a reviewable decision.  Defendants' delay has been unreasonable and unconstrained by any "'rule of reason.'" *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) ("TRAC").  As such, Fresenius Kabi is entitled to an order directing CMS to issue judicially reviewable rulings with respect to these drugs within 60 days of the Court's decision resolving Fresenius Kabi's unreasonable delay claim.  *See* 5 U.S.C. §§ 555(b), 706(1).

226.    Under the APA, agencies are obligated to resolve matters presented to them "within a reasonable time," 5 U.S.C. § 555(b), and this Court is authorized to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1); *see Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63–64 (2004); *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003) (holding that the district court had jurisdiction under 28 U.S.C. § 1331 to determine whether an agency violated section 555(b) of the APA and to issue an appropriate order under section 706(1)); *TRAC*, 750 F.2d at 80 (identify potentially relevant factors).

227.    Mandamus also is authorized in cases of unreasonable delay "to ensure that an agency does not thwart [the court's] jurisdiction by withholding a reviewable decision."  *See In re Am. Rivers*, 372 F.3d at 419 (ruling that more than "six-year[] delay" was unreasonable and

ordering the agency to "issue a judicially reviewable response . . . within 45 days" to put an "end to [the agency's] marathon round of administrative keep-away"); *see also Sandoz, Inc. v. Leavitt*, 427 F. Supp. 2d 29, 41 (D.D.C. 2006) (holding that FDA's "nearing 1000 day response time" in considering submission of new drug application "is unreasonable").

228.    The D.C. Circuit has explained that although there is "'no per se rule as to how long' to wait for agency action, [] a reasonable time for agency action is typically counted in weeks or months, not years.'" *In re Am. Rivers*, 372 F.3d at 419 (internal citation omitted); *see Midwest Gas Users Ass'n v. FERC*, 833 F.2d 341, 359 (D.C. Cir. 1987) ("[T]his court has stated generally that a reasonable time for an agency decision could encompass 'months, occasionally a year or two, but not several years or a decade.'") (quoting *MCI Telecomms. Corp. v. FCC*, 627 F.2d 322, 340 (D.C. Cir. 1980)); *accord In re Pub. Emps. for Envtl. Resp.*, 957 F. 3d 267, 274 (D.C. Cir. 2020); *see also Pub. Citizen Health Rsch. Grp. v. Auchter*, 702 F.2d 1150, 1157–59 (D.C. Cir. 1983) (per curiam) (three-year delay unreasonable); *MCI Telecomms. Corp.*, 627 F.2d at 324–25, 338–42 (four-year delay unreasonable).

229.    Defendants' delay has been egregiously unreasonable.  Fresenius Kabi submitted requests that Defendants properly classify its drugs as non-innovators in November 2016 and updated those requests in January 2020.  Proper classification is relatively straightforward.  *See STI Pharma*, 613 F. Supp. 3d at 163–68 (explaining that Congress distinguished in the MDRP between "pioneer drugs" and "follow-on drugs").  Nevertheless, years after the decision in *STI Pharma*, CMS issued initial determinations as to the drugs at issue that ignored the analysis in *STI Pharma* and refused to classify the drugs at issue here as non-innovators.  CMS further invited Fresenius Kabi to submit, within 30 days, "any supplements to or clarifications of your positions in your requests."  Fresenius Kabi submitted timely responses from February 17, 2023 to June 13,

2023, which explained that CMS's decisions were inconsistent with the MDRP and the APA and the decision in *STI Pharma*. Since then, for almost two additional years, CMS has provided no substantive response.

230.     In all, Fresenius Kabi has been waiting more than 8 years for a final decision with respect to the drugs at issue in this case. Fresenius Kabi has been substantially harmed by that delay.

231.     Fresenius Kabi's injury is ongoing and growing. A favorable decision by CMS would allow Fresenius Kabi to claw back some, but not all, of the overpayments it has been making for 8-plus years. And, even as to the overpayments that Fresenius Kabi claws back in full, Fresenius Kabi still is suffering injury because it will have lost the benefit of funds to which it was entitled for 8 plus years. *Cf. Okla. Aeronautics, Inc. v. United States*, 943 F.2d 1344, 1348 (D.C. Cir. 1991) ("A dollar received now . . . is worth more than a dollar received later . . . . Because payment is delayed, [plaintiff] loses the use of money.").

232.     CMS's unreasonable delay is particularly egregious for indomethacin injection (NDA 022536), tobramycin injection (NDA 050789), argatroban injection (NDA 201811), glucagon injection (NDA 201849), moxifloxacin injection (NDA 205572), and tigecycline injection (NDA 205645). Fresenius Kabi challenged CMS's initial determinations for these NDAs in the first half of 2023. On January 4, 2024, after waiting more than 6 months for a response, Fresenius Kabi reminded CMS about those outstanding submissions and explained that absent a response within two additional months, Fresenius Kabi reserved the right to seek further relief related to those denials. *See* Letter from C. Elkins, Fresenius Kabi to C. Denemark, CMS, at 1–2 (Jan. 3, 2024).

233.    CMS's delay also is unreasonable with respect to lidocaine hydrochloride (NDA 006488 and NDA 017584) and bupivacaine hydrochloride (NDA 018304).  As with the other six NDAs, Fresenius Kabi sought classification of these three NDAs as non-innovators in November 2016.  And, like the six other NDAs, Fresenius Kabi submitted responses to the CMS letters refusing to categorize these NDAs as non-innovators in early 2023.  Fresenius Kabi also submitted letters to CMS in 2024 with additional information and legal argument in early 2024.  It is now 2025, and CMS has not responded as to any of those NDAs.

234.    On February 20, 2024, CMS sent Fresenius Kabi a brief e-mail saying that Fresenius Kabi's submissions were "currently under review," and that "[d]ue to the volume of requests and the lack of available staff, the review of these requests ha[s] resulted in a backlog." *See* E-mail from C. Denemark, CMS to S. Chowdhury, Fresenius Kabi (Feb. 20, 2024).  On June 12, 2024, Fresenius Kabi again asked about the status of these NDAs and requested an in-person meeting to discuss the outstanding determinations for the drugs at issue here.  On June 17, 2024, CMS acknowledged receipt of Fresenius Kabi's e-mail and stated:  "we will get back to you." Now, more than nine months later, Fresenius Kabi still has not received any substantive response from CMS concerning any of the drugs at issue here.

235.    Under controlling precedent, a reasonable timetable for agency action is measured in weeks or months, not the eight years at issue here.  *In re Am. Rivers*, 372 F.3d at 419; *see Sandoz*, 427 F. Supp. 2d at 41 (same).  Defendants have unreasonably delayed resolution of Fresenius Kabi's requests for proper classification of its drugs under the MDRP.  Defendants may not insulate their actions from judicial review through a "marathon round of administrative keep-away."  *In re Am. Rivers*, 372 F.3d at 420.

236.    Nor does Defendants' assertion of a "backlog" insulate CMS's failure to render final determinations from scrutiny. CMS's "backlog" justification ignores that Plaintiff's requests have been pending since 2016 when CMS expressly invited reclassification requests. Fresenius Kabi is not seeking to jump to the front of any long-existing queue. *Cf. In re Barr Labs.*, 930 F.2d 72, 75 (D.C. Cir. 1991) ("[A] judicial order putting [plaintiff] at the head of the queue simply moves all others back one space and produces no net gain."). Rather, Fresenius Kabi submitted its requests when invited to do so by CMS. Whatever queue may exist, Fresenius Kabi's pending requests filed in November 2016 certainly must be among the oldest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.    Declare that CMS's refusal to classify the Fresenius Kabi drugs at issue as non-innovator multiple source drugs is arbitrary, capricious, and not in accordance with the law or otherwise in excess of the Agency's authority;

B.    Declare that the Fresenius Kabi drugs at issue qualify as non-innovator multiple source drugs under section 1927 of the SSA and/or the narrow exception;

C.    Vacate and set aside CMS's refusal to classify the Fresenius Kabi drugs at issue as non-innovator multiple source drugs;

D.    Remand the matter to CMS to classify the Fresenius Kabi drugs at issue as non-innovator multiple source drugs;

E.    Enjoin CMS from taking further action to classify or otherwise treat the Fresenius Kabi drugs at issue as innovator drugs;

F.    In the alternative, declare that Defendants have engaged in unreasonable delay and require Defendants to issue final determinations about the proper categorization of the drugs in

this action no later than 60 days after issuance of an Order declaring that Defendants have unreasonably delayed the resolution of Fresenius Kabi's classification requests; and

G.    Grant such other relief as this Court deems just and proper.

March 21, 2025                  Respectfully Submitted,

*/s/ Paul J. Zidlicky*
Paul J. Zidlicky (No. 450196)
pzidlicky@sidley.com
(Tel.) 202-736-8013
Sean C. Griffin
sgriffin@sidley.com
(Tel.) 202-736-8107
Brooke E. Boyd
brooke.boyd@sidley.com
(Tel.) 202-736-8529
Kevin A. Sforza
ksforza@sidley.com
(Tel.) 202-736-8413
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000
(202) 736-8711 (fax)

Trevor L. Wear (*pro hac vice* forthcoming)
twear@sidley.com
(Tel.) 312-853-7101
Rina Mady
rmady@sidley.com (*pro hac vice* forthcoming)
(Tel.) 312-853-6109
One South Dearborn
Chicago, IL 60603
(312) 853-7000
(312) 853-7036 (fax)

*Counsel for Plaintiff Fresenius Kabi USA, LLC*